J-S60009-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: H.A.D.A. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| | No. 792 MDA 2014 |

Appeal from the Dispositional Order April 7, 2014
In the Court of Common Pleas of Berks County
Criminal Division at No(s): 64-J-2014

BEFORE:  OTT, J., STABILE, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                    **FILED NOVEMBER 18, 2014**

H.A.D.A., a minor,[1] appeals from the dispositional order entered in the Berks County Court of Common Pleas, Juvenile Division.  On April 7, 2014, at the conclusion of a hearing, the juvenile court adjudicated H.A.D.A. delinquent on the charge of institutional vandalism.[2]  That same day, the court entered a dispositional order committing H.A.D.A. to the George Junior short-term residential program, and directing him to complete 40 hours of community service and to pay restitution in the amount of $8,825.00.   On appeal, H.A.D.A. challenges the sufficiency of the evidence sustaining his adjudication of delinquency.  For the reasons that follow, we affirm.

---

[1] H.A.D.A.'s date of birth is 12/3/1998.

[2] 18 Pa.C.S. § 3307(a)(3).

The facts underlying H.A.D.A.'s adjudication are as follows. On October 10, 2013, H.A.D.A. was performing community service[3] with the maintenance crew at the Third and Spruce Recreation Center ("Rec Center") in Reading, Pennsylvania. When the maintenance supervisor's shift was complete at 2:30 p.m., the supervisor permitted H.A.D.A. to "shoot some hoops to kill some time" in the Rec Center's gym until H.A.D.A. was required to report back to the community service supervisor at 2:45 p.m. N.T., 4/7/2014, at 8. H.A.D.A. was the only person in the gym when the maintenance supervisor left. At 2:55 p.m., H.A.D.A. reported to the community service supervisor in his office across the street from the Rec Center. Several witnesses testified that no one entered the gym through the front doors from 2:30 p.m. until 4:30 p.m. Although there was another door on the north side of the Rec Center, that door was accessible from the outside only with a key. However, the door could be opened from the inside without a key. *Id.* at 10-11.

At approximately 3:15 p.m., a Rec Center worker entered the building through the side door, and noticed a punctured basketball lying by a dumpster. Later, at 4:30 p.m., a Rec Center counselor entered the gym and noticed immediately that 69 of the padded mats hanging on the gym walls

_____

[3] H.A.D.A. was performing community serve pursuant to a consent decree he previously entered to charges of burglary and criminal conspiracy.

had been "slashed … with something sharp." *Id.* at 17. When questioned about the damage to the mats by a police criminal investigator, H.A.D.A. initially stated he noticed the damage, but when he tried to report it to a Rec Center employee, the employee was on a phone call, and H.A.D.A. had to leave to report back to the community service office. However, he had told his probation officer that he tried to report the damage to the community service crew supervisor, but that the supervisor responded he was on the phone and could not deal with that. About a week later, H.A.D.A. admitted to the investigator that the story he told his probation officer was a lie. H.A.D.A., however, insisted he did not damage the mats.

On March 3, 2014, a juvenile petition was filed against H.A.D.A. charging him with institutional vandalism and criminal mischief. At the conclusion of an April 7, 2014, adjudication hearing, the juvenile court adjudicated H.A.D.A. delinquent on the charges of institutional vandalism and criminal mischief.[4] That same day, the court entered a dispositional order committing H.A.D.A. to the George Junior short-term residential program, and directing him to complete 40 hours of community service and to pay restitution in the amount of $8,825.00. This timely appeal followed.[5]

---

[4] The juvenile court, thereafter, dismissed the criminal mischief charge, concluding it merged for dispositional purposes. *See* N.T., 4/7/2014, at 78.

[5] On May 9, 2014, the juvenile court ordered H.A.D.A. to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). *(Footnote Continued Next Page)*

- 3 -

On appeal, H.A.D.A. challenges the sufficiency of the evidence supporting his adjudication of delinquency on the charge of institutional vandalism. Specifically, he argues the evidence did not demonstrate that he was the person who caused the damage in the gym. He contends that while the testimony demonstrated there was no noticeable damage to the mats when the cleaning crew left at 11:45 a.m., someone else could have entered the gym through an unsecured back door and caused the damage. Further, he asserts "a mere suspicion or a significant hunch of guilt is not enough to sustain the charges beyond a reasonable doubt." H.A.D.A.'s Brief at 9.

As with any sufficiency claim, our review of an adjudication of delinquency is well-settled:

> When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the Commonwealth.
>
> In determining whether the Commonwealth presented sufficient evidence to meet its burden of proof, the test to be applied is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences therefrom, there is sufficient evidence to find every element of the crime charged. **The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by wholly circumstantial evidence.**
>
> The facts and circumstances established by the Commonwealth need not be absolutely incompatible with a defendant's

_(Footnote Continued)_ ────────────────

H.A.D.A. complied with the trial court's directive and filed a concise statement on May 19, 2014.

- 4 -

innocence. Questions of doubt are for the hearing judge, unless the evidence is so weak that, as a matter of law, no probability of fact can be drawn from the combined circumstances established by the Commonwealth.

*In re V.C.*, 66 A.3d 341, 348-349 (Pa. Super. 2013) (emphasis supplied and quotation omitted), *appeal denied*, 80 A.3d 778 (Pa. 2013).

Here, H.A.D.A. was adjudicated delinquent of the charge of institutional vandalism, which is defined in the Crimes Code as follows:

> **(a) Offenses defined.--**A person commits the offense of institutional vandalism if he knowingly desecrates, … vandalizes, defaces or otherwise damages:
>
> * * * *
>
> (3) any school, educational facility, community center, municipal building, courthouse facility, State or local government building or vehicle or juvenile detention center[.]

18 Pa.C.S. § 3307(a)(3) (footnote omitted). H.A.D.A. does not dispute that the Rec Center gym was vandalized. Rather, he contends the evidence was not sufficient to identify him as the culprit.

After a thorough review of the transcript from the adjudication hearing, we find the juvenile court, in its opinion, thoroughly and accurately summarizes the testimony presented by the Commonwealth's witnesses at the adjudication hearing. **See** Juvenile Court Opinion, 6/4/2014, at 2-6. We also conclude that the court provides a well-reasoned basis for its determination that H.A.D.A. committed the crime of institutional vandalism.

*Id.* at 6-8. Accordingly, we rest upon the juvenile court's June 4, 2014, Opinion, and find that H.A.D.A.'s sufficiency challenge fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/18/2014

IN THE INTEREST OF

H.A.D.A.

: IN THE COURT OF COMMON PLEAS OF
: BERKS COUNTY, PENNSYLVANIA
: JUVENILE DIVISION
:
: No. 64-J-2014
: *In Forma Pauperis*


Bryan P. Doughter, Esquire, Assistant District Attorney for Commonwealth of Pennsylvania

Jay M. Nigrini, Esquire, Attorney for H.A.D.A., Juvenile


MEMORANDUM OPINION, Scott E. Lash, J.                    June 4, 2014


H.A.D.A. (hereinafter "Juvenile") has appealed this Court's Order of April 7, 2014, adjudicating him delinquent on a charge of institutional vandalism and placing him at George Jr. Republic, Short Term Program. The Juvenile's sole contention on appeal is that the evidence presented by the Commonwealth was insufficient to sustain a finding by this Court of his involvement in the charge, beyond a reasonable doubt.

On or about March 3, 2014, the Commonwealth of Pennsylvania filed the within juvenile Petition against the Juvenile, alleging that he committed the acts of institutional vandalism, a felony of the third degree, under 18 Pa.C.S.A. § 3307(a)(3), and criminal mischief, a felony of the third degree, under 18 Pa.C.S.A. § 3304(a)(5). The Petition alleges that on October 10, 2013, while Juvenile was present inside the Third and Spruce Recreation Center (hereinafter "Rec Center") in Reading, Berks County, Pennsylvania, he used some type of sharp object to cut or slash 69 padded mats, attached to the walls of the Rec Center

gymnasium, causing damages, later stipulated to be Eight Thousand Eight Hundred Twenty-Five Dollars and Two Cents ($8,825.02). This Court held an adjudication hearing on April 7, 2014, and was satisfied beyond a reasonable doubt that the Juvenile had committed the offenses charged. This Court then adjudicated the Juvenile delinquent on the charge of institutional vandalism, dismissing the criminal mischief charge as having merged.

As set forth by the Pennsylvania Superior Court in the case of In the Interest of C.S., 63 A.3d 351, 354 (2013) (citation omitted), a determination of sufficiency of the evidence is based on:

> ...whether, viewing all the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt. This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Moreover, it is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. The factfinder is free to believe all, part or none of the evidence. The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the [factfinder] unless the evidence be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

Testifying first for the Commonwealth was the maintenance supervisor at the Rec Center, who stated that the Juvenile was present at the Rec Center to perform community service and was assigned to work with maintenance that day. The maintenance supervisor was with the Juvenile until approximately 2:30 p.m.,

2

when the supervisor had to attend to other business before finishing his shift. (N.T. p. 7). At that time, the Juvenile had approximately 15 minutes left on his community service detail. (N.T. p. 7). The maintenance supervisor offered to take him to the gym to "shoot some hoops to kill some time." (N.T. p. 8). The supervisor escorted the Juvenile into the gym, then left by the side entrance on the north side of the building, (N.T. p. 10), leaving the Juvenile alone in the gym. When questioned whether anything looked "out of place with any of the mats" at the gym, the supervisor responded that "everything had looked fine at that time." (N.T. p. 9). After viewing the damage to the mats the next day, the supervisor conceded, however, that it was possible that the damage had already been done when he and the Juvenile first entered the gym, as the slices were hard to notice unless you were within 5 or 6 feet of the mats. (N.T. p. 14). The north door exits on to a parking lot where there is a dumpster. The maintenance supervisor stated he did not notice anything out of the ordinary outside. (N.T. pp. 11-12).

The next Commonwealth witness was a counselor who started his shift at 4:00 p.m. on October 10, 2013, having occasion to enter the gym at about 4:30 p.m. (N.T. p. 16). When he entered the gym, there were no people inside. (N.T. p. 16). The counselor noticed immediately that the mats were cut. (N.T. pp. 16, 18). He was approximately 50 feet from the mats when he first noticed the damage. (N.T. p. 18).

3

The next Commonwealth witness was an employee of the Reading Recreation Commission, who arrived at the Rec Center at 3:15 p.m. on October 10. (N.T. p. 22). He entered through the north door, (N.T. p. 22), the same door that the maintenance supervisor had previously used to exit the building. Before entering, the Commission employee noticed a punctured basketball left outside by the dumpster. (N.T. p. 27).

Another Commonwealth witness, the Community Service Supervisor, testified that she was present for some time in the gymnasium on October 10 and left the gymnasium about 11:45 a.m. (N.T. p. 43). At the time she left, there was no damage to the mats. (N.T. p. 43).

Another Commonwealth witness was the security officer who was stationed near the front door to the Rec Center and was in charge of monitoring activity coming through the front door and the children. (N.T. p. 50). The security officer sits at a desk in the front where he can see the front door to the facility and also the entryway to the gym, which is about 10 feet or so from his location. (N.T. p. 51). On October 10, the security office began work at 3:00 p.m. (N.T. p. 52). He did not become aware of any damage done to the gym pads until he was advised by the counselor sometime after 4:00 p.m. (N.T. p. 53). He testified that no one entered the gym from the time he first sat down at his desk at 3:00 p.m. until the counselor went into the gym sometime after 4:00 p.m. and observed the damage. (N.T. p. 54).

4

Another Commonwealth witness was the Executive Director who advised the Court that she has an office which is "catty-corner" from the front door, providing her with a direct view of the front door. (N.T. p. 57). She testified that when the maintenance supervisor left the building at approximately 2:30 p.m., she stayed in her office to make sure she could keep an eye on the front door until the security officer arrived at 3:00 p.m. During that half hour, no one entered or exited the front door. (N.T. p. 58).

The last Commonwealth witness was the City of Reading Criminal Investigator, who was in charge of investigating the incident, and who, among other things, interviewed the Juvenile, who provided him with a statement. According to the criminal investigator, the Juvenile told him "that he was in the gym playing basketball. He just finished community service. He said he went to shoot the basketball and missed and it landed near the mats. And he said he got close, and he could see the mats were damaged. He said he went to notify staff members. He said he could look in. He could see one staff member was on the phone. He said he waited for a couple minutes, and eventually he had to leave because his van was coming to pick him up." (N.T. p. 66). The investigator also testified that the Juvenile admitted giving inaccurate information to his Juvenile Probation Officer about the incident. His initial statement to the Probation Officer was that after seeing the damage, he attempted to notify the head supervisor for community service crews for Berks County about the damage, but the supervisor responded:

5

"I'm on the phone; I can't deal with that right now." (N.T. pp. 67-68). When the criminal investigator questioned him about that statement, the Juvenile admitted that he did not speak to the supervisor, it didn't happen, although he continued to deny damaging the mats. (N.T. p. 68).

Defense contends that the Commonwealth's evidence does not rule out the possibility that the damages were caused by someone else sometime prior to the Juvenile entering the gym at 2:30 p.m. In support of this, defense points to the testimony of the maintenance supervisor, who, while not noticing any damage when he and the Juvenile entered the gym at 2:30 p.m., speculated that it was possible that the damages had already occurred, because he later opined that the damages were hard to notice, unless the viewer was within 5 or 6 feet of the mats.

In direct contrast to the maintenance supervisor's speculation, however, was the testimony of the counselor who was the first person to enter the gym after the Juvenile left. When he entered the gym, it was without any foreknowledge that there was something amiss, nevertheless, he immediately noticed the damage to the mats, while standing approximately 50 feet away. This testimony discounts the opinion of the maintenance supervisor that the damage was not noticeable except from close proximity. This Court believes that the maintenance supervisor's speculation was due simply to his inability to rule out the possibility that the damages were present when he was in the gym at 2:30 p.m., because he had no reason to be attentive to the condition of the mats.

6

Further corroborating the Commonwealth's belief in the Juvenile's involvement was the punctured basketball, observed by the dumpster outside the north door. The basketball was seen by the Commission employee entering the building at approximately 3:15 p.m., but was not seen by the maintenance supervisor who left by the same door shortly after leaving the Juvenile in the gym at 2:30 p.m. Accordingly, whoever placed the basketball at its location did so between 2:30 p.m. and 3:15 p.m., and was likely not one of the employees, who would have disposed of the basketball. It is also reasonable to draw the inference that the person who punctured the basketball was the same person who damaged the mats, and that this person was the Juvenile, based on the timing of the appearance of the basketball, the fact that the basketball would have come from the gym, and that the Juvenile likely exited from the north door, as the Executive Director would have seen him exit from the front door, if he had used that door.

This Court also considered the fact that the Juvenile gave two (2) different versions of what took place after the Juvenile admitted observing the damage to the mats. This compromised the Juvenile's credibility, calling into question his denials that he caused the damage. Further, the Juvenile's admission that he observed the damage completely eliminates the possibility that the damage occurred after he left the gym, at about 2:45 - 2:50 p.m., but before the counselor observed the damage at 4:30 p.m. If the damage had occurred after the Juvenile left the gym, the Commonwealth would not have been able to correlate the timing of

7

the damage to the mats to the appearance of the similarly damaged basketball.

After considering the evidence, this Court was comfortable in finding, beyond a reasonable doubt, that the evidence was sufficient to sustain a finding of the Juvenile's involvement, and that the Juvenile committed the offenses charged. Accordingly, this Court adjudicated the Juvenile delinquent and made disposition.

Respectfully submitted,

BY THE COURT:

Scott E. Lash, J.